# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
August 12, 2014 Session

## STATE OF TENNESSEE v. NICHOLAS KEITH PHILLIPS

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-68012      M. Keith Siskin, Judge**

---

**No. M2013-02705-CCA-R3-CD - Filed January 27, 2015**

---

A Rutherford County Circuit Court Jury convicted the appellant, Nicholas Keith Phillips, of two counts of rape of a child, a Class A felony, and two counts of aggravated sexual battery, a Class B felony. After a sentencing hearing, he received an effective forty-year sentence to be served at 100%. On appeal, the appellant contends that the evidence is insufficient to support the convictions and that his dual convictions for the offenses violate principles of double jeopardy. Based upon the oral arguments, the record, and the parties' briefs, we affirm the appellant's convictions of aggravated sexual battery but conclude that his dual convictions of rape of a child violate double jeopardy principles and must be merged. Moreover, because the trial court improperly sentenced the appellant, the case is remanded to the trial court for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed in Part, Reversed in Part, and the Case is Remanded.**

NORMA MCGEE OGLE J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Brittani Wright (on appeal), Murfreesboro, Tennessee, and Chris Coats (at trial), Smyrna, Tennessee, for the appellant, Nicholas Keith Phillips.

Robert E. Cooper, Jr., Attorney General & Reporter; Sophia S. Lee, Senior Counsel; William C. Whitesell, Jr., District Attorney General; and Laural Nutt Hemenway, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In May 2012, the Rutherford County Grand Jury indicted the appellant for rape of a child in counts one and two, aggravated sexual battery in counts three through six, and unlawful photography in count seven. The victim of the alleged crimes was the daughter of the appellant's girlfriend. Subsequently, defense counsel filed a motion to sever count seven from the remaining counts, and the trial court granted the motion. The appellant proceeded to trial on counts one through six on February 13, 2013.

At trial, Rachel Mullins testified that she worked as a dispatcher for the Rutherford County Sheriff's Department (RCSD). At 6:17 p.m. on January 20, 2012, Mullins received a 911 call from the victim, who lived on Leanna Road. The victim sounded "[v]ery scared and upset," and Mullins dispatched police officers to the home. The State played the call for the jury. During the call, the victim reported that she was twelve years old and that her mother's boyfriend had tried to rape her. She said that she had been taking a nap and that she asked the appellant to rub her back. She said that she woke up "with his thing on my leg" and that the appellant told her, "[I] thought that's what [you] wanted." The victim ran to the appellant's mother's home next door, but the appellant's mother was not there. The victim told Mullins that the appellant did not hurt her but that he ran after her when she ran outside. She said that she returned home and that the appellant was "trying to break in." Later, the victim told Mullins, "I don't know where he went. I don't see him anymore."

Officer Dennis Ward of the RCSD testified that he was one of the officers dispatched to the victim's home, which was part of a two-unit duplex, and arrived about 6:20 p.m. on January 20. He conducted a quick search of the area but did not find anyone. Deborah Churchill arrived shortly thereafter, and Officer Ward learned that she was a neighbor and knew the victim. Officer Ward and Churchill knocked on the front door of the victim's home, but no one answered. Churchill knocked on a window and called out the victim's name, and the victim opened the door. Officer Ward said that the victim was crying and shaking and that he asked her what was going on. The victim told him that she had gone into the back bedroom and was lying with the appellant, who was rubbing her back. She felt his penis on her leg and saw a wet spot on her jeans. Officer Ward said he remained at the scene for several hours and spoke with the victim's mother but never saw the appellant.

On cross-examination, defense counsel asked Officer Ward if the victim's mother seemed shocked by the victim's allegations. He answered, "I'm not sure shocked is the exact word that I would use. Concerned, upset." Defense counsel also asked if the victim's mother appeared to doubt the victim. Officer Ward answered, "Not necessarily."

The victim's mother testified that on January 20, 2012, she and the appellant were in a relationship and lived with her two children in one unit of a two-unit duplex. Deborah Churchill, who was her friend and the appellant's mother, lived in the unit next door. About

4:00 p.m., the victim's mother left work and went home. She and the appellant ordered Chinese food, and she left the residence in order to file her taxes. The appellant was supposed to babysit the victim, who had just turned twelve years old, and the victim's three-year-old brother.

The victim's mother testified that she arrived at the tax office and sent the appellant a text message at 5:57 p.m. A few minutes later, the appellant telephoned and told her that the victim had locked him out of the house. The victim's mother said that he sounded "irritated" and that she told him she would be right there. She tried calling the victim, but the victim would not answer the phone, so she telephoned Churchill and asked Churchill to check on the children. Churchill told the victim's mother that she was not home but was not far away and would find out what was happening.

The victim's mother testified that while she was driving home, she received a call from 911. When she arrived home, Churchill and the police were there, and a police officer was in the living room with the victim. The officer was talking with the victim "about different things, subjects like the planets and drawing pictures with her and stuff" and would not allow the victim's mother to speak with the victim until a detective arrived. While the victim's mother was waiting for the detective, she and the appellant texted each other. She acknowledged that she knew police officers were looking for the appellant and that she did not reveal the texts to them. She said that at that time, she was "[s]tupid" and thought she loved the appellant.

The victim's mother testified that Detective Scott Tillman arrived at the scene and allowed her to be present while he spoke with the victim. The victim told them what had happened and that "she saw some wet stuff on her jeans." The victim's mother said the victim described the liquid as "two little rain drops. And it was right in the same area where she saw his penis on her leg." Detective Tillman told the victim's mother that he was going to send the victim's jeans to the Tennessee Bureau of Investigation (TBI).

The victim's mother testified that the police did not apprehend the appellant that night and that someone from the Department of Children's Services (DCS) informed her that the victim would have to spend the night somewhere else. The victim's mother drove the victim to a friend's house. As she was driving home, she spoke on the telephone with the appellant, who had returned home and was getting his "stuff." She acknowledged that she did not reveal the appellant's being there to the police. The State played their conversation, which had been recorded by the appellant's laptop webcam, for the jury. During their conversation, the victim's mother told the appellant what the victim had told Detective Tillman and urged the appellant to talk to the police. However, the appellant refused, stating, "Darling, I cannot go and talk to the officers . . . . The whole pants thing has me scared [sh\*\*less], though,

because she was grinding on me. . . . Yeah, I had an erection because she kept touching my [di**]!" Referring to the victim's claim that liquid was on her jeans, the appellant asked the victim's mother, "Could it have went through my pants?" The appellant told the victim's mother that "this is just [bullsh**]" and that "I can't have these accusations." He also told her that when the police had arrived at the home that night, he "dove" under his mother's porch and stayed there while they "walked all around me."

The victim's mother testified that at some point, Detective Tillman told her that the victim's jeans had tested "positive." She said she had wanted to kill the appellant but later learned that Detective Tillman had lied to her and that the appellant's semen was not on the victim's pants. At some point, a woman from DCS interviewed the victim's mother and the victim at the Child Advocacy Center (CAC). The victim's mother said that the appellant owned a laptop computer and that, prior to this incident, he "had it in my room for a while. And then he had it in [the victim's] room for a while." She said that while the police were at her home on the night of January 20, the laptop was at Churchill's house and that the appellant must have taken it there. She also said that prior to this incident, the victim "thought the world of Churchill" and went to Churchill's house often to make cookies and crafts.

On cross-examination, the victim's mother testified that she initially thought the victim's allegations were "odd." However, she later learned that "it's normal for children who have been molested to only tell part of the truth at first. Because children are afraid of how the adult might react. Whether or not she will be believed." She stated that the victim was acting "strange" on the night of January 20 in that the victim was talking to her and Detective Tillman "in a completely normal tone of voice" but was "fiddling with her fingers" and did not want to look at anyone. The victim's mother said that intuition told her "something just wasn't right" with the victim and that "when I found out the whole truth of what he actually did do to her, I understand why she was acting that way." She said Churchill did not want to believe the victim's allegations.

The victim's mother testified that she did not know that while the police were at her home, the appellant was hiding under his mother's porch. She did not find out until she returned home from driving the victim to a friend's house. She acknowledged that on the night of January 20, the appellant had an outstanding warrant for misdemeanor drug possession. Defense counsel asked if the appellant was hiding from the police because he "didn't want to be taken in on that," and the victim's mother said that she could not "speculate as to what he was thinking." She acknowledged that she left the back door to her home unlocked that night and said that she did so because the appellant "had all of his stuff there, and he needed to get it out." She also acknowledged that the victim was jealous of her relationship with the appellant.

The victim's mother testified that someone from DCS initially told her that the victim would have to stay with a friend for the weekend. However, the weekend "came and went," but DCS would not allow the victim to return home. The police still had not apprehended the appellant, and DCS "couldn't guarantee [the victim's] safety since Nick knew where she lived." DCS also would not allow the victim's mother to speak with the victim. The victim's mother told the appellant that he needed to talk with Detective Tillman to "get this resolved," but the appellant refused. She said she was afraid DCS was going to take her children if she did not help with the investigation and "set him up" so that the victim could return home. The victim's mother telephoned the appellant, asked him to come over, and notified the police so they could "come pick him up."

The victim's mother acknowledged that after the police arrested the appellant, she contributed money to his telephone account in jail. She said she did so because she "still loved him like an idiot." She acknowledged that Detective Tillman lied to her about the appellant's semen being on the victim's jeans but said, "I appreciated it. Because . . . we found evidence that we needed to prove to me that this sick man needs to be locked up and kept away from kids." She said that Detective Tillman later found evidence on the appellant's computer and that "I have seen the evidence with my own eyes now."

On redirect examination, the victim's mother testified that the victim initially claimed that she saw the appellant's "thing" on her leg; the victim did not say anything about penetration. However, the victim's behavior caused the victim's mother to think the victim was hiding something. The appellant told the victim's mother that the victim had "wrapped her leg around him and started grinding on him." He claimed that he "scooted" away from the victim and told her to stop but that she "did it again." The appellant told the victim again to stop, and the victim ran outside. The appellant ran after her, grabbed her, and tried to take her back into the house. However, when the appellant stopped to pay for the Chinese food delivery, the victim went inside and locked him out. The victim's mother said that the appellant's account was consistent with the victim's account "except for what had happened in the bedroom." She said that about two weeks later, the victim "finally came out" and told her about the vaginal penetration. She said that she, not the appellant, was responsible for disciplining the victim and that she could not think of any reason why the victim would have been angry with him.

The then thirteen-year-old victim testified that she was born on January 14, 2000, and was in the seventh grade. On January 20, 2012, she was twelve years old and lived on Leanna Road with her younger brother, her mother, and the appellant. The appellant's mother lived next door. That evening, the victim and her brother were watching a movie in the living room, and the appellant was playing his Xbox in her mother's bedroom. The victim's mother left the home to pay taxes. About five minutes later, the victim went into

-5-

her mother's bedroom to watch the appellant play and sat on the bed. The appellant turned off the Xbox, turned off the light, and asked the victim, who was wearing jeans and a shirt, if she wanted him to rub her legs. The appellant had rubbed the victim's legs prior to January 20, and the victim answered, "[S]ure." She said that she was lying on her stomach on the bed; that the appellant, who was clothed, was lying on his side; and that he rubbed her "thighs and below" over her clothes. She stated that he "accidentally like rubbed against my butt area. . . . I thought it was an accident." The victim said that the appellant had never touched her buttocks before that night, that she felt "weird" about his touching her there, and that she rolled onto her side "to see if he wouldn't do it again."

The victim testified that she felt the appellant "tug" on her shoulder and that he pulled her onto her back. She said she that she felt him "tug" on her jeans below her waist, that she tried to pretend she was sleeping, and that she put a pillow over her head, "trying to hide." The appellant unbuttoned her pants, put his hand inside her jeans and underwear, and put his finger inside her vagina. She said that she felt "[w]eird" and "[u]ncomfortable" and that she did not know what to do. She said that the appellant took his hand completely out of her pants for "[p]robably about a couple of seconds" and that he "put it in again." She did not know what he did with his hand during that time. However, when he put his hand back into her pants, his fingers were "really wet." The appellant put his finger inside her for a second time and then took his hand out of her pants again. She said she heard him making sounds "like something felt good," that she sat up, and that she saw his "thing" on her leg. She said that she could not see if he was clothed but that she could see his "private."

The victim testified that she got up, told the appellant to stop, and ran outside. She went to Churchill's house, but Churchill was not home, so the victim ran into the field behind the duplex and toward a friend's house. The appellant caught her and said, "[P]lease stop. I thought that's what you wanted." The appellant told the victim to "please go back," so the victim ran back to the house. Someone delivering Chinese food pulled into the driveway, and the appellant stopped to pay for the food. The victim went into the house, locked the door, and called 911. The victim took her little brother into a bedroom. She said she "thought it would be safer in there" because she could hear the appellant banging on the door. Later, the victim saw that a screen had been torn from a window on the front of the house.

The victim testified that the police arrived about ten minutes later and that Churchill was with them. The victim said she did not reveal the penetration initially because she was afraid she would get in trouble for not stopping the appellant sooner than she did. The victim did not see the appellant again that night and had to stay at a friend's house for safety reasons because the police could not find him. The victim ended up staying with her friend for one or two months. Eventually, she revealed the penetration to someone at the CAC. She said

that prior to this incident, she and Churchill had a close relationship but that Churchill "really doesn't like me anymore." She also said that she was supposed to have had a party at her house for her twelfth birthday but that the appellant "took it away" for not doing her chores. The victim acknowledged that she was mad at the appellant about cancelling the party for a while but said that she was not mad at him on January 20.

The victim then revealed to the prosecutor that after the appellant touched her "butt" and she turned over, the appellant "was kind of upset." The State asked if the appellant appeared to be upset because she had turned over, and the victim said yes. She said she had wanted to make him feel better, so she hugged him by wrapping her arms around his arm. Her knees were touching the lower part of his arm, but no part of her body was touching his private area. She said she hugged him for a few seconds and turned back onto her side. The appellant then tugged at her shoulder and pulled her onto her back.

On cross-examination, the victim testified that she was jealous of the attention her mother gave the appellant and that she did not like him. She often thought that if the appellant was not involved with her mother, her mother would spend more time with her. The victim acknowledged writing a letter to her mother in February 2012 in which she stated that she hoped her mother would "never ever" love the appellant again. She also acknowledged that sometime prior to this incident, she hid in her mother's bedroom closet while her mother and the appellant were intimate. She denied taking off all of her clothes in the closet and said that she had been hiding there because she was going to play a prank on them by "jumping out." However, she never played the prank because "it got too late," and she would have been in trouble if she had revealed herself.

On redirect examination, the victim testified that, regarding the closet incident, she was wearing her pajamas and could see out of the closet but "tried not to look." She heard her mother and the appellant kissing and making "feel good noises," the same noises she heard the appellant make on January 20. The victim's mother and the appellant left the bedroom to check on the victim, did not see her in her bed, and began looking for her. The victim came out of the closet and "[got] like totally like in trouble." The victim said that she would not lie to get the appellant in trouble because "[i]t's not right to get somebody in trouble for no reason and make them suffer for their life just to get attention." She said that she saw three or four drops on her pants on the night of January 20, that they were about the size of a "Skittle," and that she did not notice them until she ran back into the house.

Detective Scott Tillman of the RCSD testified that he arrived at the victim's home at 6:54 p.m. on January 20. He said he spoke with the victim only briefly because he wanted professionals to conduct her forensic interview and did not want to "put words in her mouth." The victim told Detective Tillman that the appellant's private had been on her leg and that

some small wet droplets were on her jeans. The appellant's red truck was in the driveway, but the appellant was not present, and Detective Tillman had no idea where to find him. Detective Tillman and the victim walked around the residence, and she showed him where she ran. He noticed that a window screen had been ripped off a window by the front door and was lying near a bush below the window. Detective Tillman did not look under the back porch. He said he thought the appellant "was on the run because of what he did" and did not know the appellant had an active warrant. He said that he remained at the victim's home until 11:13 p.m. and that his main concern was making sure she had a safe place to go for the night. Detective Tillman sent the victim's jeans to the TBI to test for the presence of semen.

Detective Tillman testified that on February 2, 2012, the victim's mother told him that the appellant was "next door." Detective Tillman and another officer began watching the duplex and witnessed the appellant and a friend leave in a vehicle. The officers stopped the vehicle, and the appellant told them that his name was Charles Adcock. However, Detective Tillman recognized the appellant and arrested him. The appellant was put in jail, and Detective Tillman began listening to his jailhouse telephone calls. The detective said that from the appellant's conversations with the victim's mother, he knew they were "still somewhat in a relationship." Detective Tillman said the victim's mother "was not totally believing" the victim. Therefore, he told the victim's mother that DNA evidence had been found on the victim's jeans. He said that the victim's mother "wasn't too happy," that she gave him information about the appellant's computers, and that "[s]he really helped us out a whole lot after that point."

Detective Tillman testified that on March 13, 2012, he obtained a DNA sample from the appellant. On March 21, 2012, the victim's mother told Detective Tillman that the victim had more information about what had happened with the appellant. Detective Tillman set up a second forensic interview for the victim at the CAC. During that interview on March 30, the victim revealed digital vaginal penetration by the appellant. On April 20, 2012, Detective Tillman executed a search warrant on the appellant's parents' home and collected the appellant's red computer. At some point, Detective Tillman learned from the TBI that semen was not on the victim's jeans. The TBI had tested the jeans only for the presence of semen.

On cross-examination, Detective Tillman acknowledged that he lied to the victim's mother about the appellant's DNA being on the jeans. He said he did so because he believed the victim's story and because the victim's mother was protecting the appellant. He said that from the appellant's jailhouse telephone conversations with the victim's mother, he "knew what was going on in that household" and felt it necessary to protect the victim.

Detective Steven Craig testified that on April 20, 2012, he assisted Detective Tillman

with the execution of a search warrant at the appellant's parents' duplex unit on Leanna Road. During the search, Detective Craig found a red laptop computer and collected it as evidence.

Matt Stephenson, a special agent with the United States Secret Service, testified as an expert in electronic crimes recovery that he received the appellant's red laptop computer from the RCSD and "pull[ed] the data off" the computer's hard drive. The computer had an "active" webcam and "a piece of software that support[ed] video type play." Agent Stephenson obtained videos made by the webcam. One of videos, which he played for the jury, recorded the victim from 5:17 p.m. to 5:47 p.m. on January 20, 2012.

At the conclusion of the State's proof, it announced the following election of offenses: count one, rape of a child, concerned the appellant's first digital penetration of the victim's vagina; count two, rape of a child, concerned the appellant's second digital penetration of the victim's vagina while his fingers were wet; count five, aggravated sexual battery, concerned the appellant's penis touching the victim's leg; and count six, aggravated sexual battery, concerned the appellant's touching the victim's buttocks. The State elected to dismiss the aggravated sexual battery charges in counts three and four.

Richard Churchill, the appellant's stepfather, testified for the appellant that he was an over-the-road truck driver and that the victim's family used to live beside his family. Churchill said that he would see the victim's mother every time he was home because she was his wife's friend but that he did not see the victim often. He said that he "didn't like the vibe [he] got" from the victim's family, that the victim's mother was "a little uppity," and that the victim appeared to have "issues." Specifically, the victim did not seem truthful and was disrespectful to her mother. In December 2011, the victim gave Churchill a handmade greeting card. He said that he read the card but did not understand it and that the card made him "very uneasy." After he read the card, he told his wife never to leave him alone with the victim. When his wife asked him why, he told her that "it just don't feel right" and that he did not want to be around the victim. Churchill did not meet the appellant until the appellant was about twenty years old. He said that he liked the appellant, that the appellant was "very knowledgeable about everything," and that the appellant was "very articulate."

On cross-examination, Churchill testified that he was not home on January 20, 2012. The State showed him a card made from purple construction paper, and he identified it as the one the victim gave him. Inside the card, the victim had written, "Dear Mr. Richard, I hope your life will be last-longing and enjoyable! I think you are very nice and fun to be with! Hope you have a nice weekend!" The victim had signed the card with her full name and had dated it December 9, 2011. Churchill said he never told the appellant not to be alone with the victim but told him that "there's something wrong with her." He said he did not like the

victim's mother but "tolerated" her for his wife. He denied that prior to dating the appellant's mother, he had asked the victim's mother on a date and that she turned him down. He said he had never seen the appellant's red computer in his home.

At the conclusion of the proof, the jury convicted the appellant of both counts of rape of a child, a Class A felony, and both counts of aggravated sexual battery, a Class B felony. After a sentencing hearing, the trial court sentenced him to concurrent twenty-year sentences for the child rape convictions. The trial court sentenced him to ten years for the aggravated sexual battery convictions to be served consecutively to each other and to the sentences for rape of a child for a total effective sentence of forty years to be served at 100%.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the convictions. Regarding the rapes, he claims that the victim was not credible due to the "lengthy delay" in her revealing the vaginal penetration to the police and because she acknowledged lying about the incident. Regarding the aggravated sexual battery conviction in count five, he contends that the evidence is insufficient because the TBI failed to find semen where his penis touched her jeans. Regarding the aggravated sexual battery conviction in count six, he claims that the evidence is insufficient because it fails to show that he touched her buttocks intentionally. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age or less but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). As charged in this case, "[a]ggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by the victim" when the victim "is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). "'Sexual contact' includes the intentional touching of the victim's [or] the defendant's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

As to the appellant's convictions of rape of a child, although the victim did not reveal the vaginal penetration initially, she explained at trial that she failed to do so because she was afraid she would get in trouble for not stopping the appellant sooner than she did. As to his aggravated sexual battery conviction in count five, the jury heard the appellant tell the victim's mother that the victim was "grinding" on him and that he had an erection because the victim kept touching his penis, supporting the victim's claim that he had unlawful sexual contact with her. Although the TBI failed to find semen on the victim's jeans, the jury, as was its prerogative, obviously accredited the victim's testimony and resolved any discrepancies in favor of the State.

As to the appellant's conviction of aggravated sexual battery in count six, the victim testified that she went into her mother's bedroom, that the appellant turned off his Xbox and the light, and that he laid on the bed with her. He asked if she wanted him to rub her legs, which he had done previously, and she answered, "[S]ure." The appellant began rubbing the victim's "thighs and below." He also "rubbed against [her] butt area." Alarmed, the victim

turned onto her side to determine if the appellant would touch her buttocks again. The victim said that the appellant appeared upset that she had turned over and that she hugged him to make him feel better. She then turned back onto her side. Although the appellant did not touch her buttocks again, he tugged on her shoulder, pulled her onto her back, and put his hands in her pants and underwear. The State argues that, based on the victim's testimony, it was reasonable for the jury to infer that the appellant rubbed her buttocks intentionally. We agree with the State. Given that appellant appeared upset by the victim's changing her position after he touched her buttocks and that he then pulled her onto her back and penetrated her vagina with his fingers, we conclude that, under the standard announced in Dorantes, the evidence is sufficient to support the conviction for aggravated sexual battery in count six.

## B. Double Jeopardy

The appellant contends that his dual convictions of rape of a child are improper because the two penetrations were part of a single, continuous sexual episode. Similarly, he argues that his dual convictions of aggravated sexual battery cannot stand because his rubbing her buttocks and touching her leg with his penis "consolidated into one single act of sexual contact." The State argues that the appellant has waived this issue because he failed to include it in his motion for new trial and, in any event, his dual convictions do not violate double jeopardy. We affirm the appellant's convictions of aggravated sexual battery but conclude that his dual convictions of rape of a child violate double jeopardy and must be merged.

Regarding the State's waiver argument, an issue for which a new trial is sought may be waived if a defendant fails to raise it in a motion for a new trial. See Tenn. R. App. P. 3(e). However, the remedy for a double jeopardy violation is not a new trial but a dismissal of a charge or merger of convictions. See, e.g., State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). Therefore, we will address the issue on its merits.

"Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense." State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996). Multiple convictions for the same offense violate federal and state constitutional prohibitions against double jeopardy. See U.S. Const. amend. V; Tenn. Const. art. I, § 10. "Whether multiple convictions violate double jeopardy is a mixed question of law and fact that we review de novo with no presumption of correctness." State v. Smith, 436 S.W.3d 751, 766 (Tenn. 2014).

The double jeopardy clauses of the United States and Tennessee Constitutions protect an accused from (1) a second prosecution following an acquittal; (2) a second prosecution

following conviction; and (3) multiple punishments for the same offense. See State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). The instant case concerns the third category, protection against multiple punishments for the same offense in a single prosecution. "Multiple punishment claims fall into one of two categories: (1) unit-of-prosecution claims; or (2) multiple description claims." State v. Barry H. Hogg, ___ S.W.3d ___, No. M2012-00303-SC-R11-CD, 2014 Tenn. LEXIS 668, at *13 (Nashville, Sept. 25, 2014) (citing Watkins, 362 S.W.3d at 543). This case involves unit-of-prosecution claims because the appellant is asserting that dual convictions under the same statute are for the same offense. Id. at *13-14. "'In determining the unit of prosecution, we first examine the statute in question to determine if the statutory unit of prosecution has been expressly identified.' If the unit of prosecution is clear from the statute, there is no need to review the history of the statute and other legislative history." Id. at *14 (quoting Smith, No. M2011-00440-SC-R11-CD, 2014 Tenn. LEXIS 466 at *12). However, "any ambiguity in defining the unit of conduct for prosecution is resolved against the conclusion that the legislature intended to authorize multiple units of prosecution." Watkins, 362 S.W.3d at 543 (citing Gore v. United States, 357 U.S. 386, 391-92 (1958)).

Regarding the appellant's dual convictions of rape of a child, our supreme court recently analyzed the unit of prosecution for statutory rape, which is identical to rape of a child except that statutory rape specifies that "the victim is at least thirteen (13) but less than eighteen (18) years of age and the defendant is at least ten (10) years older than the victim" while rape of a child specifies that the victim is less than thirteen. See Hogg, No. M2012-00303-SC-R11-CD, 2014 Tenn. LEXIS 668, at *15 (quoting Tenn. Code Ann. § 39-13-506(c)). Noting that "[t]the definition of 'sexual penetration' is broad and includes different examples of sexual activity, including 'any other intrusion, however slight,'" the court determined that the unit of prosecution "is each act of 'unlawful sexual penetration.'" Id. However, unlike the instant case, the facts in Hogg involved various sexual penetrations that occurred over the span of one hour. See State v. Barry H. Hogg, No. M2012-00303-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 329, at *4 (Nashville, Apr. 13, 2013). Therefore, we are not convinced that the supreme court's analysis in Hogg is dispositive of the multiplicity issue in this case.

As this court has repeatedly stated, in determining whether offenses are multiplicitous, a court should consider the following principles:

> 1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;
>
> 2. If each offense charged requires proof of a fact not required

in proving the other, the offenses are not multiplicitous; and

3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

Phillips, 924 S.W.2d at 665 (footnotes omitted). In sexual offenses, the following factors are also relevant:

1. temporal proximity--the greater the interval between the acts, the more likely the acts are separate;

2. spatial proximity--movement or re-positioning tends to suggest separate acts;

3. occurrence of an intervening event--an interruption tends to suggest separate acts;

4. sequence of the acts--serial penetration of different orifices as distinguished from repeated penetrations of the same orifice tends to suggest separate offenses; and

5. the defendant's intent as evidenced by conduct and statements.

State v. Barney, 986 S.W.2d 545, 548-49 (Tenn. 1999)

Turning to the instant case, the victim testified that the appellant put his hand into her pants and underwear and put his finger into her vagina. He then completely removed his hand from her pants, put his hand back into her pants and underwear, and inserted his finger into her vagina for a second time. The State asked the victim, "How long was it between the first time he took it out and the second time he put it back in?" The victim answered, "I can't really remember. Probably about a couple of seconds. I'm not sure." Both counts of child rape involved the appellant's and the victim's same body parts and were separated by only a few seconds. The victim was lying on her back for both penetrations; the appellant did not reposition her.

On appeal, the State argues that the appellant put lubricant on his fingers during the brief time his hand was out of her pants and that his doing so demonstrated newly formed

-14-

intent to support two convictions of rape of a child.[1] The State bases its argument on the victim's testimony that the appellant's fingers were wet when he put them back into her jeans and that she saw droplets on her pants where the victim's penis had been. However, the idea that the appellant lubricated his fingers is based on pure speculation by the State. The victim testified that the appellant's hand was out of her pants for only a few seconds, no testimony was presented by the victim or police that a lubricant was found in the bedroom, and the State presented no scientific evidence to show that a lubricant dripped onto the victim's jeans. In any event, even assuming arguendo that the appellant applied a lubricant to his fingers, our supreme court has stated that "if the act in question directly facilitates or is merely incidental to the accompanying sexual conduct (such as, for example, applying lubricant to the area of intended copulation), convictions for both acts would be barred." Barney, 986 S.W.2d at 548. Therefore, we conclude that the appellant's convictions of rape of a child must be merged.

As to the appellant's convictions of aggravated sexual battery, as stated previously, aggravated sexual battery requires unlawful sexual contact with a victim. See Tenn. Code Ann. § 39-13-504(a)(4). Like "sexual penetration," the definition of "sexual contact" is very broad, including "the intentional touching of the victim's [or] the defendant's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). The touchings in this case involved the appellant's and the victim's different body parts, i.e., his touching her buttocks with his hands and his touching her leg with his penis. The victim was lying on her stomach when the appellant touched her buttocks but was lying on her back when he touched her leg. Also, although the two offenses occurred close in time to each other, they were separated by the victim's trying to comfort the appellant and the vaginal penetrations. Finally, when the appellant's penis touched the victim's leg, he suddenly began making what the victim described as "feel good sounds." The two counts for aggravated sexual battery involved two separate incidents of unlawful sexual contact, and the evidence was sufficient to support those convictions. Therefore, we conclude that the appellant's dual convictions of aggravated sexual battery are proper.

Given our conclusion that the appellant's convictions of rape of a child must be merged, the case is remanded to the trial court in order for the court to resentence the appellant for all of his convictions. Moreover, although not raised by either party, we note that the trial court sentenced the appellant to twenty years for each rape of a child conviction. However, a defendant convicted of this offense must be punished as a Range II offender in which the minimum punishment for Class A felony is twenty-five years. See Tenn. Code Ann. § 39-13-522(b)(2)(A).

---

[1]The State also made this argument to the jury during closing arguments.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the appellant's convictions of rape of a child violate double jeopardy and must be merged. Furthermore, the trial court improperly sentenced the appellant to twenty years for his those convictions.  Therefore, the case is remanded to the trial court for resentencing as to all convictions.

_____
NORMA McGEE OGLE, JUDGE